Filed 5/23/22  P. v. Rivera CA2/4
(opinion following remittitur recall)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B306136 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA143615) |
| v. | |
| JOSE DE JESUS RIVERA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Vacated in part; affirmed in part; and remanded in part with instructions.

Michelle T. LiVecchi-Raufi, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Jose Rivera of multiple counts of conspiracy to commit assault, extortion, and murder, as well as assault, based on his role as a facilitator for the Mexican Mafia. The jury also found true gang enhancement allegations as to each count. On appeal, he argued that there was insufficient evidence to support his conviction on one count of conspiracy to commit assault. In an opinion filed November 9, 2021, we affirmed the conviction. The Supreme Court subsequently denied appellant's petition for review.

While appellant's appeal was pending, the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699) (AB 333), amending Penal Code section 186.22 to require proof of additional elements for gang enhancement allegations. At appellant's request, we vacated our prior opinion and permitted supplemental briefing on the applicability of AB 333 to his conviction.

We reissue the portion of our prior opinion addressing appellant's original challenge to his conviction for conspiracy to commit assault, again rejecting appellant's claim of insufficient evidence to support his conviction. With respect to AB 333, the parties do not dispute that appellant is entitled to the benefit of the amendments to the gang enhancement statute, and that the People did not offer sufficient evidence to warrant the imposition of the gang enhancements under section 186.22 as amended. Accordingly, we vacate the gang enhancement findings and affirm the remainder of the judgment. On remand, the People may elect to retry appellant on the gang enhancement allegations. If the People do not elect to retry appellant, then the trial court shall resentence him accordingly.

## PROCEDURAL HISTORY

An amended information[1] filed on August 14, 2019 charged appellant with the following counts: conspiracy to commit assault likely to cause great

---

[1] The original information filed on December 29, 2017 charged appellant and several other defendants with three counts of conspiracy and one count of attempted murder, as well as a fifth count charged against another defendant. The relevant amended information naming only appellant was filed after the court granted the People's motion to consolidate this case with two other cases charging appellant with three additional counts. Count five of the original information was omitted. The three added

2

bodily injury (Pen. Code, § 182, subd. (a)(1); count one),[2] conspiracy to commit extortion (§ 182, subd. (a)(1); count two), conspiracy to commit murder (§ 182, subd. (a)(1); count three), attempted murder (§§ 664, 187, subd. (a); count four), conspiracy to commit assault likely to cause great bodily injury (§ 182, subd. (a)(1); count six), assault (§ 245, subd. (a)(4); count seven), and conspiracy to commit murder (§ 182, subd. (a)(1); count eight). As relevant here, the information alleged that appellant committed counts one and two on or about July 11, 2016 and counts three and four in November 2016, all against victim Enrique Cienfuegos. The information further alleged that appellant committed all seven counts for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(B)).

On September 5, 2019, the jury found appellant guilty as charged on counts one, two, and six through eight, and found the gang enhancement allegations true. The jury deadlocked on counts three and four; thus, the court declared a mistrial as to those counts and the People subsequently dismissed them.

The court sentenced appellant to a total of 33 years to life in state prison, consisting of three years on count one, plus three years for the gang enhancement, a consecutive term of one year on count six, plus one year for the gang enhancement, and a consecutive term of 25 years to life on count eight. The court imposed and stayed six-year terms on counts two and seven pursuant to section 654.

Appellant timely appealed. On November 9, 2021, we issued a decision affirming the judgment. The Supreme Court denied appellant's petition for review on January 19, 2022 and we issued the remittitur on January 21, 2022.

On February 4, 2022, appellant filed a motion to recall the remittitur and a request to file supplemental briefing addressing whether he was

---

counts were charged and tried as counts five, six, and seven. However, the court subsequently issued new minute orders and amended abstracts of judgement omitting count five and correcting the counts to six, seven, and eight, as identified here.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

3

entitled to relief under AB 333. We granted the motion, vacating our November 9, 2021 opinion and recalling the remittitur. The parties thereafter filed supplemental briefing in which they agreed that AB 333 applies to this case.

## FACTUAL BACKGROUND

I.     *Prosecution Evidence*

On appeal, appellant challenges only his conviction on count one, the conspiracy to commit assault against Cienfuegos. We therefore relate only the evidence adduced at trial relevant to that challenge.

A.     *Background*

Special Sergeant Joseph Talamantez of the Federal Bureau of Investigation (FBI) testified about a multi-agency task force, including the FBI and the Los Angeles County Sheriff's Department (LACSD), that worked to investigate the gang activities of the Mexican Mafia within the Los Angeles County jail system. Talamantez explained that the Mexican Mafia dates back to the 1950s in California. The organization is a "gang of gangs" whose leaders are made up of the senior leadership of a number of Hispanic street gangs in Southern California. The Mexican Mafia controls Hispanic inmates within the county jail system, making money by "taxing" inmates in various ways, as well as imposing discipline for rule violations through extorted fines and physical violence.

There are currently about 140 "members" of the Mexican Mafia at the top of the organization. To insulate themselves from the daily operations of the organization and attendant law enforcement investigations, Mafia members use "facilitators," who coordinate and communicate with all levels of the organization. An out-of-custody facilitator is an individual outside the jail system who can relay communications between outside members and inmates working for the Mexican Mafia. Inside jails, the Mafia uses "shot callers" as in-custody facilitators and supervisors of Mafia activities; a shot caller may control a building, dormitory, or other specific area of a jail, and manages the soldiers and other Mafia operatives in that area.

4

B.    *Appellant's arrest and interviews*

After about six months of investigation, appellant was identified by authorities as an out-of-custody facilitator and an associate of the Mexican Mafia. He was arrested on June 29, 2017. On July 4, 2017, appellant participated in two interviews with LACSD Deputy Kevin Self and Lieutenant Kevin Lloyd. The first interview focused on information specific to this case. The second interview was a "debrief" covering general background information on the Mexican Mafia. Recordings of both interviews were played at trial.

Appellant told his interviewers that he was initially approached by Mexican Mafia members about 10 years ago, and had been working for the Mexican Mafia in the jail system for about two years. He admitted that as of July 2016, he was working for a Mexican Mafia member identified as "MM2," doing drug sales, collecting money, and "structur[ing] all his business." After MM2 was killed in October 2016 (unrelated to this case), appellant began working for another Mexican Mafia member identified as "MM3," but also assisted other Mexican Mafia members who reached out to him. Appellant reported that he was the "number two guy" for MM3.

C.    *Evidence related to count 1 regarding victim Cienfuegos*

LACSD Deputy Corey Mattice testified regarding the Inmate Telephone Monitoring System (ITMS), which records all inmate jail calls made from within Los Angeles County jail facilities. An inmate is able to make an outgoing call from a payphone in the jail, using his or her booking number and a PIN code. One of the parties must pay for the call and both must consent to the call being recorded. The prosecution presented evidence of multiple ITMS calls regarding the Mexican Mafia's orders to assault Cienfuegos.

1.    *July 11, 2016 call*

In July 2016, Mattice reviewed an inmate phone call made on July 11, 2016. The call discussed an intended assault on an inmate referred to as "Chunky," later determined to be Cienfuegos. Mattice notified Operation Safe Jails (OSJ), a specialized unit handling in-custody attacks. Cienfuegos was transferred into protective custody.

5

The prosecution played the ITMS recording of the July 11, 2016 phone call at trial. The call involved appellant, MM2, and inmate Daniel Ramos, also known as "Banger," a dorm shot caller for the Mexican Mafia.

Ramos initiated the call, appellant answered, and Ramos then established his identity:

"[Ramos]: Hey what's up my boy.

"[Appellant]: Hey who's this?

"[Ramos]: This ASAP. . . . [¶] [T]his Banger from Rancho.

"[Appellant]: Who?

"[Ramos]: Banger.

"[Appellant]: Danger?

"[Ramos]: Yeah B.A.N.G.E.R, like gangbanger.

"[Appellant]: Oh Banger, oh Banger from Rancho. Look um hey is-is-is this is you from Rancho?

"[Ramos]: Yeah, yeah."

Appellant then asked Ramos to "explain the situation of what happened when you . . . tried to get at 'G' ["Grizzly," another inmate] about old boy next door." Appellant then explained that "old boy next door" was referring to Cienfuegos. Ramos confirmed that appellant wanted him to explain Ramos's earlier conversation with Cienfuegos regarding "what we [Ramos and appellant] talked about yesterday right?" Appellant said "Yeah . . . give me a second. Pops [MM2] wants to hear."

After appellant and MM2 discussed another matter briefly in the background, MM2 asked appellant the name of the caller and appellant told him it was "Banger." MM2 then took the phone from appellant and spoke to Ramos, asking "what's up with that vato Chunky [Cienfuegos]?" MM2 asked where Ramos had seen Cienfuegos and Ramos explained that Cienfuegos was "right here in the 800's right now." Ramos further explained that he had asked Cienfuegos about a rumor going around that Cienfuegos "was no good," but Cienfuegos denied any problem.[3] Ramos reported that he then talked to "G" about Cienfuegos, and "G" explained that Cienfuegos was "just not in

---

[3] Deputy Self testified at trial that this meant Cienfuegos was "in bad standing with the Mexican Mafia," because he had made statements regarding the Mexican Mafia that displeased some members.

good eyesight with . . . the loved one [a Mexican Mafia member] . . . he just wants him to get a 39[4] by some . . . solid homies." In response, MM2 stated: "[A]ll I want is someone to smack this motherfucker upside his head for a couple of times just to let him know to keep his mouth shut." Ramos responded "yeah," and MM2 said, "Yeah well I'm giving you a verbal [order], I'm letting you know this motherfucker needs to get smacked upside his head a couple of times." Ramos asked that "you just want him to get a 39 a couple of times then?" MM2 confirmed: "Just whoop his ass that's all. I don't care on the 39, 44, 53 I don't care." Ramos responded that "it will be carried out."

MM2 then handed the phone back to appellant, telling Ramos that "if you need anything just-just holler at Junior [appellant] and Junior will let me know, right?" After appellant came back on the line, Ramos told him "don't trip-on . . . that tip, I-I got it you know what I mean consider it done?" Appellant told Ramos, "you . . . heard it from . . . pops [MM2]. . . . [¶] It is what it is you just got to give him something so you know he knows we don't fuck around." Appellant continued: "after that um go ahead and let him [Cienfuegos] know but after that he's gonna get fined." He then asked MM2,[5] "how much . . . you need from . . . Chunky?" MM2 responded, "I just want a[n] ass whooping for him." Appellant asked MM2, "You don't want to fine him? You wanna fine him?" MM2 stated they should tell Cienfuegos to pay a $500 fine.

Appellant resumed talking to Ramos, stating that after the assault, MM2 "wants 500 asap." Ramos confirmed the $500 fine, then noted to appellant, "On the side that he's on there's . . . a lot of homie[s] over there that are um let[']s call them politician . . . so I know that they're gonna be trying to uh call whoop-d-whoop whoever they call and try to see what's up with this."[6] Appellant responded:

---

[4] This refers to an assault on an individual by a group of Mexican Mafia soldiers for 39 seconds.

[5] Appellant's discussions with MM2 can be heard in the background of the phone call, as the two men were in the same location.

[6] As Deputy Self explained it, this refers to Ramos's concern about "[p]eople that would go out and call other Mexican Mafia members hoping to . . . eliminate this order."

"[Appellant]: Look my boy they can't call anybody cause you heard it from the source that's it.

"[Ramos]: Right.

"[Appellant]: Anybody that interferes and they get that shit.

"[Ramos]: Alright.

"[Appellant]: They question, they question it my boy you know that they . . . get it done cause you know you heard it from the source so they ain[']t gotta go nowhere else."

In the background, appellant explained to MM2 that Ramos was "saying that there is a lot of people in that dorm that they have a lot of pull so they might . . . try to call another tio [Mafia member] and stop it. Appellant then came back to the phone and told Ramos, "Alright he said . . . you know just do what I told you my boy anybody questions they get it to[o] and they get fined. . . . [¶] Just say you know what I heard it from . . . the source and that's it and you were on the phone with the source and that's it my boy." Appellant then told Ramos, "if you get that shit done right now then call me as soon as you[']re] done.

In his interview, appellant listened to a recording of the July 11, 2016 phone call. He confirmed that MM2 wanted Cienfuegos to be fined $500 and "beat up" for talking to law enforcement. Appellant told investigators that he was not able to personally order a fine, he had to get approval from a Mafia member or he could "get whacked."

    2.    *November 2016 phone calls and assault of Cienfuegos*

After MM2's death in October 2016, Cienfuegos was returned to the general prison population. ITMS captured several phone calls regarding Cienfuegos in November 2016, which were played at trial.

On November 3, 2016, inmate Miguel Garcia, a building shot caller, called Daniel Bustamante, also known as "Doughboy," appellant's "right hand man." In the call, Bustamante told Garcia not to hang around with Cienfuegos. The next day, November 4, 2016, Garcia called Bustamante again and Bustamante handed the phone to appellant. Referring to Cienfuegos, appellant told Garcia, "that fool needs to be unplugged" and "[h]is batteries need to be removed." Garica asked for confirmation, and appellant responded that he had "already called" and received confirmation from a

8

Mexican Mafia member, "so when that happens, just call me and I'll call and tell them it's finished." Garcia told appellant that "it's gonna get done."

In his July 2017 interview, appellant explained that "unplugged" and "batteries need to be removed" meant badly beating or stabbing Cienfuegos, not killing him.[7] Appellant stated that he relayed this second order because Cienfuegos had denied and "contested" the earlier order to beat and fine him.

On November 8, 2016, Garcia and three other inmates attacked Cienfuegos in jail. Cienfuegos was stabbed multiple times. The prosecution played video of the attack at trial. The same day, ITMS recorded a call from inmate Edgardo Moreno (a Mafia "soldier") to Bustamante, during which Moreno reported that "everything was good." In his interview, appellant agreed that Moreno was "confirming the order that it was completed." He explained that he needed confirmation that it was done, or Mafia members would keep trying to send people to carry out the order.

D.    *Remaining counts*

In support of counts six and seven, alleging a conspiracy to assault and the assault of another inmate, Leonel Castillo, the prosecution presented an October 2, 2016 phone call. During that call, appellant told an inmate shot caller that Castillo "needs his birthday hug all the way to the bars." This meant that Castillo was to be severely assaulted. Castillo was attacked on October 3, 2016.

Count eight alleged a conspiracy to murder inmate Eddie Nunez. In support of this count, the prosecution presented evidence that during several phone calls in November 2016, appellant ordered an inmate shot caller to have Nunez killed.

II.    *Defense Evidence*

Appellant presented no affirmative evidence.

---

[7] The prosecution argued that these statements were an order to kill Cienfuegos, in support of counts three and four for conspiracy to commit murder and attempted murder. The jury failed to reach a verdict on those counts.

9

## DISCUSSION

I. *Insufficiency of the Evidence*

Appellant contends there was insufficient evidence to support his conviction on count one for conspiracy to assault Cienfuegos. We disagree.

A. *Legal Standards*

We review claims challenging the sufficiency of the evidence to uphold a judgment under the substantial evidence standard. Under that standard, we review "the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128; see also *People v. Dalton* (2019) 7 Cal.5th 166, 243.) "In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."" (*People v. Dalton, supra,* 7 Cal.5th at p. 244, quoting *People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." (*People v. Bean* (1988) 46 Cal.3d 919, 933, quoting *People v. Hillery* (1965) 62 Cal.2d 692, 702.)

Section 182 prohibits a conspiracy by two or more people to "commit any crime." (§ 182, subd. (a)(1).) The offense of conspiracy requires proof that the defendant and another person (1) "had the specific intent to agree or conspire to commit an offense"; (2) had "the specific intent to commit the elements of that offense"; and (3) one or more of the parties to the conspiracy committed "an overt act" in furtherance of the conspiracy. (*People v. Johnson* (2013) 57 Cal.4th 250, 257 (*Johnson*), quoting *People v. Morante* (1999) 20 Cal.4th 403, 416; see § 184; see also *People v. Homick* (2012) 55 Cal.4th 816, 870 (*Homick*).) The overt act need not be a criminal offense, nor must it be committed by the defendant. (*People v. Morante, supra*, 20 Cal.4th at p. 417.)

"The crime of conspiracy punishes the agreement itself and 'does not require the commission of the substantive offense that is the object of the conspiracy.'" (*Johnson, supra*, 57 Cal.4th at p. 258, quoting *People v. Swain*

10

(1996) 12 Cal.4th 593, 599.) "'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."'" (*People v. Maciel* (2013) 57 Cal.4th 482, 515–516; *Homick, supra*, 55 Cal.4th at p. 870 [the element of agreeing to commit a crime "must often be proved circumstantially"].)

Although mere association does not prove a criminal conspiracy (*People v. Manson* (1976) 61 Cal.App.3d 102, 126), "common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy. [Citation.] The circumstances from which a conspiratorial agreement may be inferred include 'the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties [and] the interests of the alleged conspirators. . . .'" (*People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20–21.)

B. *Analysis*

1. *Agreement and specific intent to commit assault*

Appellant argues there was insufficient evidence at trial to prove that he entered into an agreement to assault Cienfuegos or that he formed the intent to commit that assault. We are not persuaded.

The prosecution's central evidence in support of count one at trial was the July 11, 2016 phone call between appellant, Ramos, and MM2. Appellant contends that he participated in that conversation only at the beginning and the end, but the intermediate portion of the call discussing the assault was only between Ramos and MM2 and "did not involve appellant." By attempting to compartmentalize his involvement, appellant ignores the fluid nature of the phone call and the evidence of his role in it.

Appellant admitted his role as a facilitator for the Mexican Mafia included communicating messages between members and Mafia-affiliated inmates. Consistent with this role, he received the phone call on July 11, 2016 from Ramos, who identified himself with his gang moniker.[8]

---

[8] Appellant's contention that Ramos was "an unknown caller to him" is not supported by the record. Appellant told investigators that he had never

Appellant referred to prior conversations Ramos had with appellant and another inmate, Grizzly, regarding a rumor that Cienfuegos had spoken to law enforcement and was not in good standing with the Mafia as a result. Appellant asked Ramos to recount his conversation with Cienfuegos on this topic to MM2, and handed the phone to the Mafia member. From this evidence, the jury could reasonably infer that appellant had already discussed the issue of Cienfuegos's standing with both Ramos and MM2, appellant knew Cienfuegos was currently located near Ramos in jail, and he understood and agreed that Cienfuego's behavior warranted punishment.

After Ramos told MM2 that Cienfuegos was located "right here" in the jail, MM2 gave Ramos the "verbal" that he wanted "someone to smack this motherfucker upside his head for a couple of times just to let him know to keep his mouth shut." MM2 directed Ramos to call appellant "if you need anything." Appellant then came back to the phone and Ramos confirmed to him that he should "consider it done." Appellant confirmed the assault order from MM2, telling Ramos that he should "give [Cienfuegos] something so . . . he knows we don't fuck around" and that after the assault, Ramos should let Cienfuegos know "that he's gonna get fined." After conferring with MM2 over the amount, appellant confirmed to Ramos that after the assault, Cienfuegos would have to pay a $500 fine. When Ramos expressed concern that other inmates might try to appeal to another Mafia member to cancel the assault order, appellant again confirmed to Ramos that he "heard it from the source" and that anyone who interfered would "get it to[o] and they get fined." Appellant ended the call with Ramos by telling him to "get that shit done right now then call me as soon as you['re] done."

Viewing the call as a whole, the jury reasonably could have found that appellant was involved with issuing the order to assault Cienfuegos, from his discussions with MM2 during the call, his position as the point person for any follow up, and his repeated confirmations to Ramos that the assault order was valid and would serve its purpose as a warning to Cienfuegos. As such,

---

met Ramos, but he did not say he did not know him. Moreover, from appellant's statements at the start of the July 11, 2016 call, the jury could infer that appellant was familiar with Ramos and had talked to him the previous day.

the jury could have found that appellant entered into an agreement with MM2 and Ramos to assault Cienfuegos and intended for the assault to be carried out.

Additional evidence supports this conclusion. Appellant admitted in his July 2017 interview that he had been working for the Mexican Mafia for two years, and that he was the "number two guy." After listening to the recording of the July 11, 2016 phone call, he confirmed that MM2 wanted Cienfuegos to be fined $500 and "beat up" for talking to law enforcement. He also personally issued a second order to assault Cienfuegos in November 2016, resulting in the assault a few days later, and confirmed to the authorities that he issued the second order because Cienfuegos had contested the first one.

Appellant attempts to downplay his involvement by noting that he was an "associate" of the Mafia, rather than a member or a soldier, that he did not have the authority to make such an assault order himself, and that there was no evidence he committed any related crimes prior to this call. While this evidence might support the alternate conclusion that he did not harbor the requisite intent for a conspiracy charge, it does not establish the insufficiency of the evidence in favor of the jury's verdict. (See *People v. Earp* (1999) 20 Cal.4th 826, 887–888, quoting *People v. Proctor* (1992) 4 Cal.4th 499, 528-529 ["our opinion that the circumstances also might reasonably be reconciled with a contrary finding does not render the evidence insubstantial"].)

Appellant also argues that the record at most supports a "suspicion" that he agreed to the assault, and that his association with the Mexican Mafia, without more, is not enough to establish a conspiracy. His citation to *People v. Hardeman* (1966) 244 Cal.App.2d 1, 42 (*Hardeman*) does not assist his claim. In *Hardeman*, the court found substantial evidence supported the defendant's conviction for conspiracy to commit arson. The court noted that the "incendiary burning and the collection of insurance may raise a suspicion of the owner's complicity," but that evidence alone was insufficient to establish the requisite agreement. (*Ibid*.) However, that evidence was sufficient when taken together with other evidence, such as the defendant's subsequent statements and conduct. (*Ibid*.) The court also found that while "mere association" cannot establish a conspiracy, "[w]here there is some

13

evidence of participation or interest in the commission of the offense, it, when taken with evidence of association, may support an inference of a conspiracy to commit the offense." (*Id.* at p. 41.) Here, appellant's admitted association with the Mexican Mafia, coupled with his conversation with Ramos and MM2, was sufficient to establish the conspiracy.

Thus, viewing the evidence in the light most favorable to the prosecution, a jury reasonably could have concluded beyond a reasonable doubt that appellant agreed with the order to assault Cienfuegos and intended to have that assault committed.

### 2. *Overt act*

Appellant also contends that none of the three overt acts alleged in support of count one was proven beyond a reasonable doubt and therefore cannot support his conspiracy conviction. We disagree.

The amended information alleged three overt acts in support of count one (and the same three in support of count two, conspiracy to commit extortion): "1. On July 11, 2016, Daniel Ramos, an associate of the Mexican Mafia calls Defendant Jose Rivera, also an associate of the Mexican Mafia, and notifies him that Victim Cienfuegos has entered the Los Angeles County Jail System. [¶] 2. On July 11, 2016, during the same call, Daniel Ramos and Defendant Jose Rivera discuss the fact that Victim Cienfuegos is possibly cooperating with law enforcement by discussing Mexican Mafia business with law enforcement. [¶] 3. On July 11, 2016, during the same call, Defendant Jose Rivera instructs Daniel Ramos to extort $500 from Victim Cienfuegos and have him physically assaulted."

The prosecution was required to prove at least one overt act taken in pursuance of the assault. (See *Johnson, supra*, 57 Cal.4th at p. 259, citing § 184 ["[A]n agreement to commit a crime, by itself, does not complete the crime of conspiracy. The commission of an overt act in furtherance of the agreement is also required."]; *People v. Alleyne* (2000) 82 Cal.App.4th 1256, 1260 ["Although several overt acts may be alleged, the prosecution need only prove one."].) "'[A]n overt act is an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime.'" (*People v. Zamora* (1976) 18 Cal.3d 538, 549, fn. 8.) The overt act "need not amount to a criminal attempt and it need not

14

be criminal in itself." (*Johnson, supra*, 57 Cal.4th at p. 259.) "'Disagreement as to who the coconspirators were or who did an overt act, or exactly what that act was, does not invalidate a conspiracy conviction, as long as a unanimous jury is convinced beyond a reasonable doubt that a conspirator did commit some overt act in furtherance of the conspiracy.' [Citation.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 120–121.)

Once again, appellant attempts to downplay his participation in the July 11, 2016 phone call, arguing that his only involvement was in "answering the phone and handing it over" to MM2. He asserts that the conversation regarding the assault took place only between Ramos and MM2. As a result, he contends that the alleged overt acts were factually incorrect to the extent they described conversations between appellant and Ramos, and thus did not support his participation in the conspiracy to assault Cienfuegos. As we discussed above, this argument does not accurately reflect the July 11, 2016 call as a whole. In particular, appellant's statements toward the end of the call confirmed the orders to both assault and fine Cienfuegos, assured Ramos that he did not need to worry about interference from other Mafia members, and instructed him that any dissenters would also "get it too." From this evidence, the jury could have found that the prosecution proved beyond a reasonable doubt that, as alleged in the third overt act, appellant "instruct[ed] Daniel Ramos to extort $500 from Victim Cienfuegos and have him physically assaulted." There was also evidence from the start of the call supporting the conclusion that appellant and Ramos discussed that Cienfuegos was "not in good standing" with the Mexican Mafia, based on the rumor that Cienfuegos was discussing Mafia business with law enforcement, thereby establishing the second overt act alleged. As such, appellant's argument that he simply handed the phone to MM2 and then discussed only the fine order with Ramos is not supported by the record.

II.    *AB 333*

Effective January 1, 2022, AB 333 "amends section 186.22 to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343 (*Lopez*).) Specifically, AB 333 "amended the definitions of 'criminal street gang' and 'pattern of criminal gang activity' and clarified the evidence needed to establish [that] an offense

15

benefits, promotes, furthers or assists a criminal street gang. Previously, the statute defined a 'criminal street gang,' as 'any ongoing organization, association, or group of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity.' (Former § 186.22, subd. (f).) Assembly Bill 333 narrowed the definition to 'an ongoing, organized association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity.'" (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477–478, quoting revised § 186.22, subd. (f), italics added.)

As for what constitutes a "pattern of criminal gang activity," previously the prosecution needed to prove "only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another." (*People v. Sek* (2022) 74 Cal.App.5th 657, 665 (*Sek*), citing former § 186.22, subd. (e).) "Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, both predicate offenses must have been committed 'within three years of the date the current offense is alleged to have been committed,' by gang 'members,'" as opposed to any persons, and must have "commonly benefited a criminal street gang." (*Sek, supra*, 74 Cal.App.5th at p. 665, quoting § 186.22, subd. (e)(1).)

We agree with the parties that appellant is entitled to the benefit of AB 333's amendments to section 186.22 as his judgment was not yet final at the time the legislation took effect. (See *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087 ["[W]e agree [AB] 333's amendments to section 186.22 that became effective January 1, 2022 apply retroactively . . . to a defendant whose judgment is not yet final. . . ."]; *Lopez, supra*, 73 Cal.App.5th at pp. 343–344 ["'[A] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to the pending case.' [Citation.]"].)

Furthermore, respondent Attorney General concedes that while "the prosecution presented two predicate offenses to prove the gang enhancement, . . . there was no evidence that the persons who were convicted of these

16

offenses were gang members, as opposed to associates." Indeed, respondent cites evidence that the predicate offenses were committed by associates, and does not dispute that such association was insufficient to satisfy the requirements of amended section 186.22, subdivision (e)(1).[9] (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 477.)

Accordingly, we vacate the gang enhancement findings made pursuant to section 186.22, subdivision (b)(1) and remand the matter "to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22." (*Lopez, supra*, 73 Cal.App.5th at p. 346; see also *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032–1033.)

### DISPOSITION

We vacate the gang enhancement findings on counts one, two, and six through eight. In all other respects, the judgment is affirmed.

We remand this matter to the trial court to afford the People an opportunity to retry the gang enhancements. If the People elect not to retry these enhancements, then appellant shall be resentenced in a manner consistent with this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

WILLHITE, ACTING P.J.

CURREY, J.

---

[9] In light of this concession, we need not reach appellant's additional arguments that the evidence was insufficient to establish other requirements under section 186.22, including that Mexican Mafia members were acting collectively and that the predicate offenses "commonly benefited" the gang.

17